UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOHN S. ELLIOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO. 1:10-cv-0791-DML-RLY |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| | ) |
| Defendant. | ) |

# Entry on Judicial Review

Plaintiff John S. Elliott applied for Disability Insurance Benefits (DIB) and Supplemental Security Income disability benefits (SSI) on September 21, 2005,[1] alleging that he has been disabled since April 12, 2005, because of injuries to both knees. (*See* R. 71-72). In his legal memorandum preceding the administrative hearing, Mr. Elliott alleged that his disability was also due to pain in his knees, ankles, hands, lower back, neck, and right shoulder, and to depression and anxiety. (R. 181).

Acting for the Commissioner of the Social Security Administration, an administrative law judge ("ALJ") held a hearing on July 7, 2008, and issued a decision on November 17, 2008, that Mr. Elliott is not disabled because, although he is no longer able to perform his past relevant work, he is capable of performing a range of sedentary work consistent with the demands of jobs

---

[1] Two programs of disability benefits are available under the Social Security Act: Disability Insurance Benefits (under Title II of the Act) for persons who have achieved insured status through employment and withheld premiums, 42 U.S.C. § 401 *et seq.,* and Supplemental Security Income disability benefits (under Title XVI of the Act) for uninsured individuals who meet income and resources criteria, 42 U.S.C. § 1381 *et seq.* The regulations applicable to DIB and SSI disability benefits are virtually the same and, for ease of reference, the DIB regulations are cited in this Entry. The parallel sections of the SSI disability regulations are located at 20 C.F.R. §§ 900 *et seq.* and 20 C.F.R. §§ 416.1400 to 416.1499.

as a cashier, assembler, or hand packer, and those jobs exist in significant numbers in the relevant economy.  The National Appeals Council denied review of the ALJ's decision, rendering the ALJ's decision for the Commissioner final.  Mr. Elliott filed this civil action for judicial review under 42 U.S.C. § 405(g), which governs judicial review of both DIB and SSI claims.  *See* 42 U.S.C. § 1383(c)(3) (providing that judicial review of SSI claims is governed by section 405(g)).[2]

Mr. Elliott asks the court to reverse the ALJ's decision and award benefits, or to remand for further proceedings, on the grounds that the ALJ's determinations at steps three and five of the familiar sequential analysis are not supported by substantial evidence.  He also contends that the ALJ failed to address evidence favorable to Mr. Elliott, improperly assessed Mr. Elliott's credibility, and failed properly to account for his exertional and nonexertional impairments as part of the ALJ's residual functional capacity determination.  Finally, he asserts that because the vocational expert did not know whether the jobs he testified Mr. Elliott could perform existed within a reasonable distance from Mr. Elliott's home, this proves Mr. Elliott "is totally disabled." (Plaintiff's opening brief, Dkt. 23, at p. 25).

For the reasons discussed below, the Commissioner's decision is remanded for reconsideration consistent with this opinion.

### Standard for Proving Disability

To prove disability, a claimant must show that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

---

[2]   The parties consented to the magistrate judge conducting all proceedings and ordering the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

2

period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Mr. Elliott is disabled if his impairments are of such severity that he is not able to perform the work he previously engaged in and, if based on his age, education, and work experience, he cannot engage in any other kind of substantial gainful work that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A). The Social Security Administration ("SSA") has implemented these statutory standards by, in part, prescribing a five-step sequential evaluation process for determining disability. 20 C.F.R. § 404.1520(a)(4).

Step one asks if the claimant is currently engaged in substantial gainful activity; if he is, then he is not disabled. Step two asks whether the claimant's impairments, singly or in combination, are severe; if they are not, then he is not disabled. A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The third step is an analysis of whether the claimant's impairments, either singly or in combination, meet or equal the criteria of any of the conditions in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing of Impairments are medical conditions defined by criteria that the SSA has pre-determined are disabling, so that if a claimant meets all of the criteria for a listed impairment or presents medical findings equal in severity to all the criteria for the most similar listed impairment, then the claimant is presumptively disabled and qualifies for benefits. *Sims v. Barnhart,* 309 F.3d 424, 428 (7th Cir. 2002).

If the claimant's impairments do not satisfy a listing, then his residual functional capacity (RFC) is determined for purposes of steps four and five. RFC is a claimant's ability to do work on a regular and continuing basis despite his impairment-related physical and mental limitations. 20 C.F.R. § 416.945. At the fourth step, if the claimant has the RFC to perform his

past relevant work, then he is not disabled. The fifth step asks whether there is work in the relevant economy that the claimant can perform, based on his age, work experience, and education (which are not considered at step four), and her RFC; if so, then he is not disabled.

The individual claiming disability bears the burden of proof at steps one through four. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987). If the claimant meets that burden, then the Commissioner has the burden at step five to show that work exists in significant numbers in the national economy that the claimant can perform, given his age, education, work experience, and functional capacity. 20 C.F.R. § 416.960(c)(2); *Young v. Barnhart,* 362 F.3d 995, 1000 (7th Cir. 2004).

## Standard for Review of the ALJ's Decision

Judicial review of the Commissioner's (or ALJ's) factual findings is deferential. A court must affirm if no error of law occurred and if the findings are supported by substantial evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence means evidence that a reasonable person would accept as adequate to support a conclusion. *Id.* The standard demands that there be more than a scintilla of evidentiary support, but does not demand a preponderance of the evidence. *Wood v. Thompson,* 246 F.3d 1026, 1029 (7th Cir. 2001). This limited scope of judicial review follows the principle that Congress designated the Commissioner, not the courts, to make disability determinations:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of whether [the claimant] is severely impaired as defined by the SSA regulations. Nor may we reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner. Our task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.

*Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004) (internal citations omitted). *See also Cannon v. Apfel,* 213 F.3d 970, 974 (7th Cir. 2000) (court reviews record as a whole, but does not

4

substitute its judgment for the ALJ's judgment by reweighing evidence, or resolving conflicts, or reconsidering the facts or witness credibility). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the court must defer to the Commissioner's resolution of this conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir. 1997). A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel,* 131 F.3d 1228, 1234 (7th Cir. 1997), or based the decision on serious factual mistakes or omissions. *Sarchet v. Chater,* 78 F.3d 305, 309 (7th Cir. 1996).

The ALJ is required to articulate a minimal, but legitimate, justification for his decision to accept or reject specific evidence of a disability. *Scheck v. Barnhart,* 357 F.3d 697, 700 (7th Cir. 2004). If an ALJ concludes that benefits should be denied, he must have first built an accurate, logical bridge between the evidence and his conclusion. *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008). The ALJ need not address every piece of evidence in his decision, but he must trace the path of his reasoning and connect the evidence to his findings and conclusions. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).

## Analysis

### The ALJ's Five-Step Findings

Mr. Elliott was born on September 10, 1970, was 34 years old at the time of the alleged April 2005 onset of disability, and 38 years old at the time of the ALJ's decision. The ALJ found that Mr. Elliott had engaged in substantial gainful activity during a portion of the time—all of 2007 and the first quarter of 2008—he claimed to be disabled. During that time, Mr. Elliott's average monthly earnings constituted substantial gainful activity. His earnings did not rise to the

level of substantial gainful activity in 2005 or 2006.³ At step two, the ALJ found that Mr. Elliott had one severe impairment: an ACL (anterior cruciate ligament) tear of the left knee (R. 12). He rejected Mr. Elliott's testimony that right knee problems, back and neck problems, ankle dysfunction, bilateral hand and right shoulder problems, depression, and anxiety were also severe impairments. (*See* R. 15-16).

At step three, the ALJ evaluated the medical evidence against listings 1.02A and 1.02B, and found that based on Mr. Elliott's medical history and the hearing testimony of Dr. Arthur Lorber, a board certified orthopedic surgeon, Mr. Elliott's knee impairment did not meet or medically equal a listing. The ALJ evaluated the medical evidence, relied on Dr. Lorber's testimony, and assessed Mr. Elliott's credibility in determining Mr. Elliott's residual functional capacity. He concluded that Mr. Elliott could occasionally lift 20 pounds, frequently lift 10 pounds, could walk or stand no more than four hours per day and only one hour continuously, but had no restrictions regarding sitting. Also because of Mr. Elliott's knee problems, any job could not require operating a machine with a foot pedal involving the left foot, balancing, squatting or crawling, climbing of ladders, scaffolds, or ropes, working at unprotected heights or around dangerous moving machinery, or more than occasional kneeling. (R. 16).

---

³ Contrary to Mr. Elliott's argument in his reply brief, the ALJ did not *reject* the conclusion that Mr. Elliott had engaged in substantial gainful activity. Rather, the ALJ found that even though Mr. Elliott had engaged in SGA at some points during the period of his alleged disability, he decided to continue to proceed along the five-step sequential analysis. (*See* R. 12). It is true, as Mr. Elliott states, that the ALJ's opinion does not rely in any way on Mr. Elliott's having engaged in SGA as a basis for doubting Mr. Elliott's credibility. The Commissioner's statement that Mr. Elliott's testimony regarding his employment during the period of disability "suggested that his condition was not as severe as he alleged" (Dkt. 28 at 8) is an improper attempt to bolster the ALJ's decision on grounds the ALJ did not purport to rely on. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947) (Agency decision is judged "solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis").

The ALJ determined that Mr. Elliott could not perform his past relevant work as a cook or retail manager because those jobs required Mr. Elliott to walk or stand more than four hours per day and perform other functions beyond his capacity. (R. 17). At step five, the ALJ found, based on the testimony of a vocational expert, that there are a significant number of jobs suiting Mr. Elliott's residual functional capacity—as a cashier, assembler, and hand packer, all of which are sedentary, unskilled jobs. Accordingly, the ALJ determined that Mr. Elliott is not disabled. (R. 18).

**A.      The ALJ's step three analysis is supported by substantial evidence.**

Mr. Elliott contends that the ALJ erred at step three in finding that his knee problems did not meet or medically equal listing 1.02A. He does not challenge the ALJ's conclusion regarding listing 1.02B. (Plaintiff's opening brief, Dkt. 23, at p. 17: "The ALJ ignored all of the evidence proving that John Elliott's knee problems met or medically equaled the requirements for [listing 1.02A] and thus was presumptively disabled.")

As Mr. Elliott acknowledges, a requirement of listing 1.02A is that a dysfunctional weight-bearing joint (such as a knee) result "in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02A. Mr. Elliott does not inform the court, however, of the manner in which the SSA defines effective and ineffective ambulation in 1.00B2b. Under 1.00B2b, the inability to ambulate effectively means an *extreme* limitation on the ability to walk that requires a person to use a hand-held assistive device "that limits the functioning of both upper extremities." The ALJ ruled that listing 1.02A was not met because the assistive device that Mr. Elliott uses to assist walking—a cane that he has used regularly since about 2006—requires the use of only one hand, not two. Dr. Lorber also testified that there was no clinical evidence that Mr. Elliott's impairments meet or equal a listing.

7

Mr. Elliott has not met his burden that any listing was met or medically equaled. The ALJ's finding that Mr. Elliott did not suffer from an "inability to ambulate effectively" as defined in the regulations is supported by substantial evidence.

**B.     The ALJ's RFC analysis is incomplete in one respect.**

Mr. Elliott challenges the ALJ's RFC analysis on three grounds. First, he argues that the ALJ unfairly cherry-picked through the medical evidence regarding his left knee, leaving out the records demonstrating that Mr. Elliott's left knee problems cause him to fall. Second, he argues that the ALJ improperly ignored the opinions of his physician that he was "disabled." Third, he argues that the ALJ should have credited Mr. Elliott's claims regarding the limiting effects of his impairments and accounted for them in deciding whether Mr. Elliott was disabled. Each point is discussed in turn below.

   **1.   The ALJ's RFC analysis did not ignore evidence of Mr. Elliott's left knee dysfunction or its instability.**

Mr. Elliott claims the ALJ cherry-picked the medical evidence by choosing to address the evidence that supports his analysis but ignoring or improperly rejecting the evidence that did not. (Plaintiff's opening brief, Dkt. 23, at p. 25). Mr. Elliott's challenge focuses on the ALJ's analysis of the medical evidence regarding his left knee. He does not assert that the ALJ erred in evaluating Mr. Elliott's other claimed impairments, including alleged shoulder pain and dysfunction, neck and back pain and dysfunction, bilateral ankle pain and dysfunction, right knee injuries, and mental health deficiencies.

The ALJ's analysis of Mr. Elliott's left knee dysfunction fairly explores the history of Mr. Elliott's left knee problems. He discussed the history of surgeries to Mr. Elliott's knees, going back to the 1990s, and gave a detailed summary of examinations, surgeries, and treatment of Mr. Elliott's knee. He recounted that Mr. Elliott first had a left knee ACL reconstruction in

the early 1990s, after injuring himself playing basketball, which was torn again in 1993 and surgically repaired, and that he injured his right knee in a fall, also in the 1990s, which was treated with arthoscopic surgery and cleaned out. (R. 14-15). Mr. Elliott's left knee was x-rayed again in 2004 after he had fallen; no fracture was seen but the prior ACL repair was noted. (*Id.*). In 2005, Mr. Elliott injured his left knee again and felt it "pop." (R. 15). Mr. Elliott began treatment in 2005 at Wishard Hospital for his left knee pain, and after being referred to an orthopedic specialist, he was scheduled for surgery in 2006 to reconstruct the ACL. (R. 14). Mr. Elliott refused the surgery. (R. 15). An x-ray taken on March 24, 2007, showed that Mr. Elliott's left knee had mild degenerative changes and no acute process. (R. 16). In addition, the ALJ discussed Dr. Lorber's opinion that the medical records show that Mr. Elliott needs another left ACL reconstruction surgery. (*Id.*).

The ALJ did not discuss every record recounting a problem with Mr. Elliott's left knee, but his analysis covers nearly all of the medical records for the entire period of, and year preceding, Mr. Elliott's alleged disability, and many of those records recount Mr. Elliott's historical treatment, which—as related above—was discussed by the ALJ. Although the ALJ did not cite to records from 2002 and 2003 reflecting that Mr. Elliott had fallen and his left knee had "given out," there was no need for him to address specifically every single medical record. The ALJ covered the history of Mr. Elliott's left knee injuries, symptoms, and treatment, and there is no indication that he ignored an entire line of evidence. *See Jones v. Astrue,* 623 F.3d 1155, 1162 (7th Cir. 2010) (ALJ is not required to discuss every piece of evidence but is "prohibited only from ignoring an entire line of evidence that supports a finding of disability").

Indeed, the ALJ found that the medical evidence documented that Mr. Elliott has severe left knee dysfunction and associated pain, and the ALJ credited that Mr. Elliott needs an assistive

9

medical device (either a cane or a left knee brace) to stabilize himself and walk. The ALJ relied on Dr. Lorber's opinion that without surgery, Mr. Elliott needs a left knee stabilizing brace and without a brace, Mr. Elliott medically needs a cane in order to walk, which he was prescribed about 18 months before the hearing. He also relied on the report of the state examining physician, Dr. Elpidio Feliciano, that Mr. Elliott's gait becomes steady and slow but normal when he uses his cane. Far from disregarding evidence of Mr. Elliott's left knee problems, including instability and pain, the ALJ's opinion reflects his belief that "[t]he evidence indicates the claimant has 'severe' left knee pain and dysfunction." (R. 16).

### 2. The ALJ omitted discussion of Dr. Dasgupta's opinion of "disability."

Beginning in June 2005, Mr. Elliott was seen three times at the Wishard Hospital clinic by Dr. Debasish Dasgupta for evaluation of his knee problems. The ALJ noted Mr. Elliott's first visit to the clinic in June 2005 (and that Dr. Dasgupta referred him to the orthopedic clinic for further evaluation) and third visit with Dr. Dasgupta on December 13, 2005, at which the results of an MRI of Mr. Elliott's left knee were discussed. He also addressed the reference in a February 2006 treatment note that an appointment was to be made for ACL reconstruction surgery (*see* R. 136), and noted Mr. Elliott's decision to decline surgery. (R. 15 "The claimant testified that he declined to have the scheduled left knee ACL reconstructive surgery").

The ALJ did not, however, discuss the records of Mr. Elliott's October 2005 examination by Dr. Dasgupta or a December 28, 2005 letter written by the doctor—the two records in which Dr. Dasgupta expressed opinions regarding Mr. Elliott's disability. Although an ALJ is *not* bound to give controlling weight or any special significance to a claimant's physician's opinion on issues reserved to the Commissioner—such as whether the claimant is disabled (SSR 96-5p)—the ALJ still must carefully evaluate that kind of opinion in light of all the evidence in the

10

record and determine the extent to which it is supported by the record. *Id.* ("Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner").

On October 4, 2005, at Mr. Elliott's second visit with Dr. Dasgupta, the doctor completed a medical verification form related to Mr. Elliott's request for financial assistance from the local government township trustee. Dr. Dasgupta wrote that Mr. Elliott was "temporarily" disabled for "at least another 6 months" and was waiting to be evaluated by an orthopedic surgeon. On December 28, 2005, following Dr. Dasgupta's treatment of Mr. Elliott on December 13, the doctor wrote a "to whom it may concern" letter stating that Mr. Elliott had torn cartilage in his knee that was very painful, did not allow Mr. Elliott to "perform work requiring physical strength," and that the inability to work would probably last another six months. (R. 139).

The Commissioner argues that even if the ALJ should have addressed Dr. Dasgupta's opinion, his omission to do so was inconsequential because Dr. Dasgupta believed that the disability would last only six months. Under the Social Security Act, an impairment must last or be expected to last for a continuous period of at least 12 months. *See* 42 U.S.C. § 423(d)(1)(A). But Dr. Dasgupta's opinion regarding Mr. Elliott's inability to work or "temporary" disability evolved over time. Initially, the six month period stemmed from October 4, 2005, and Dr. Dasgupta prescribed a cane for Mr. Elliott to use for one year (R. 158), but by December 28, 2005, Dr. Dasgupta still believed that Mr. Elliott's inability to work would last *another* six months (R. 139, 147). It appears too that Dr. Dasgupta was tying a possible end to Mr. Elliott's period of "disability" to his evaluation and treatment by an orthopedic surgeon. (*See* R. 180 (disability "for [a]t least another 6 months. [Patient] is waiting for a MRI and evaluation by orthopedic surgeon"; R. 147 (patient has torn cartilage which does not allow him to perform

11

work requiring physical strength. He is waiting to be seen by the orthopedic surgeons. This period of inability to work will probably be at least for the next 6 months"). Given that Mr. Elliott declined to have surgery and he was still using a cane in 2008 (which Dr. Lorber believes he needs for stability if he does not use a brace), Dr. Dasgupta's opinion may not so readily be rejected as incompatible with the twelve-month period of disability under the Social Security Act.

Further, a substantial portion of the examination of Dr. Lorber at the hearing by both the ALJ and Mr. Elliott's counsel concerned the weight of Dr. Dasgupta's opinion regarding Mr. Elliott's inability to work, and Dr. Lorber's evaluation of Dr. Dasgupta's opinion. (*See* R. 226-230). The ALJ's discussion of only selected records of Dr. Dasgupta's treatment, the emphasis at the hearing on Dr. Dasgupta's views of Mr. Elliott's work abilities or "disability," and the omission of any discussion of Dr. Dasgupta's opinions in the ALJ's decision—when an ALJ should carefully evaluate those kinds of opinions in light of all the evidence in the record as provided in SSR 96-5—convince the court that the ALJ's decision does not fully account for evidence that may not support his conclusion. *See Kasarsky v. Barnhart,* 335 F.3d 539, 543 (7th Cir. 2003) (ALJ must confront evidence that does not support his conclusion and explain why the evidence was rejected). The Commissioner's suggestion that the ALJ could reject Dr. Dasgupta's opinion for the same reasons Dr. Lorber testified he did does not excuse the ALJ from evaluating Dr. Dasgupta's opinion, deciding the weight to give it, and citing the evidence relied on to support that decision. *See Chenery,* 332 U.S. at 196 (agency decision is decided on the grounds that the agency invoked).

### 3. The ALJ's negative credibility determination is not patently wrong.

If Mr. Elliott's description of the limiting effects of his knee problems and pain were believed, then no jobs are available to him and he is disabled. (*See* R. 240). Mr. Elliott testified that he is able to stand for only 15 minutes at a time, can walk only half a block, can lift items no heavier than 5 to 10 pounds, can sit for only 20 minutes at a time before pain becomes so great that he must rock his upper body back and forth to achieve relief, cannot bend or kneel without feeling pain, and must use a cane to avoid falling down. He testified that without a cane, he falls more than once every day; although, he also claimed that he falls two to three times per week. Mr. Elliott claimed too that the pain medications he takes daily (Vicodin and ibuprofen) relieve his pain only slightly.

Mr. Elliott's attacks on the ALJ's negative credibility assessment are dressed in hyperbole that cannot be squared with the ALJ's decision. It is simply not true that the ALJ "rejected or ignored all evidence" regarding Mr. Elliott's pain, or that the ALJ failed to consider "any" of the factors the SSA requires an ALJ to consider in evaluating a claimant's description of the limiting effects of his impairments, including pain symptoms. (*See* plaintiff's opening brief, Dkt. 23, at p. 23). Stripped of the hyperbole, Mr. Elliott provides one concrete example of an error he claims the ALJ made in assessing his credibility—that the ALJ unfairly criticized his refusal to have surgery. (*Id.*).

### a. A two-part test guides an ALJ's credibility assessment.

A two-part test determines whether a claimant's descriptions of his own limitations contribute to a finding of disability. First, the claimant must provide objective medical evidence of an impairment or combination of impairments that could be expected to produce the symptoms he alleges. Second, the ALJ must consider the intensity and persistence of the alleged

symptoms. 20 C.F.R. § 404.1529(a)-(c). The ALJ must consider the claimant's subjective complaints in light of the relevant objective medical evidence, as well as any other evidence of the following factors:

(1) The claimant's daily activities;

(2) Location, duration, frequency, and intensity of pain or other symptoms;

(3) Precipitating and aggravating factors;

(4) Type, dosage, effectiveness, and side effects of any medication;

(5) Treatment, other than medication, for relief of pain or other symptoms;

(6) Other measures taken to relieve pain or other symptoms;

(7) Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

Having considered these factors, the ALJ may make a reasoned credibility determination based upon the evidence about whether the claimant acts, day in and day out, like a person would act who is really suffering from the symptoms the claimant alleges. It is not necessary for the ALJ to recite findings on each factor, but the ALJ must give reasons for the weight given to the claimant's statements so that the claimant and subsequent reviewers will have a fair sense of how the claimant's testimony was assessed. *See* SSR 96-7p; *Brindisi v. Barnhart,* 315 F.3d 783, 787-88 (7th Cir. 2003) (ALJ must comply with SSR 96-7p in making a credibility determination by articulating the reasons behind the determination). The court will not set aside an ALJ's credibility determination if there is some support in the record unless it is "patently wrong." *Luna v. Shalala,* 22 F.3d 687, 690 (7th Cir. 1994).

### b. The ALJ adequately explained why he decided that Mr. Elliott was not credible.

The ALJ found that Mr. Elliott was not "a totally credible witness," and discussed the reasons he reached that conclusion. They included the disparity between Mr. Elliott's subjective complaints and the objective medical evidence (as described and contrasted by Dr. Lorber), the lack of any evidence for mental impairments that Mr. Elliott claimed to suffer, the disparity between Mr. Elliott's claim that he falls down nearly every day and the observation by the consultative physician that Mr. Elliott has a mildly antalgic gait and is not unsteady if he uses his cane, and Mr. Elliott's refusal to receive treatment (surgery on a torn ACL) that his treating orthopedic surgeon scheduled him to have. (R. 16-17). Mr. Elliott testified he refused the surgery to treat his left knee the day of the scheduled surgery because he "changed [his] mind," was "tired of being cut on," had "bad feelings about it," and "had a bad dream." (R. 221-222).

### c. The ALJ did not err by discrediting Mr. Elliott's complaints of pain and other symptoms because he refused to have surgery.

The ALJ did not err by discounting Mr. Elliott's credibility in part on the grounds that he refused surgery to treat his knee. The ALJ rationally could determine that Mr. Elliott's subjective descriptions of excruciating pain because of his knee were not believable when Mr. Elliott refused to undergo the treatment recommended—and indeed scheduled—by his orthopedic surgeon for his left knee impairment. SSR 96-7p specifically notes that an "individual's statements [regarding his pain or other symptoms] may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." *See Coleman v. Astrue,* 269 Fed. Appx. 596, 603 (7th Cir. 2008) (ALJ has "solid grounds" for not believing claimant's statements regarding limiting effects of his

pain where claimant fails without legitimate excuse to comply with treatment). Before drawing a negative inference from a claimant's failure to follow-through with treatment, the ALJ must consider any explanations that the claimant offers. The ALJ complied with that requirement, and Mr. Elliott gave the explanations described above.

Contrary to Mr. Elliott's argument, SSA regulation 20 C.F.R. § 404.1530 does not govern the ALJ's credibility determination or forbid an ALJ from deciding that a claimant's refusal to have prescribed surgery harms his credibility. That regulation prohibits an ALJ from finding that a claimant is disabled if a claimant refuses prescribed treatment without a good reason and if the prescribed treatment would restore the claimant's ability to work. *Shramek v. Apfel,* 226 F.3d 809, 812 (7th Cir. 2000) (where ALJ denies benefits because the claimant refused to undergo treatment, it must be supported by finding that if the treatment were followed, the claimant could return to work). The ALJ did not rule that Mr. Elliott was not disabled because he would not undergo surgery. He did not suggest that Mr. Elliott's knee problems would be completely remediated if he had surgery. The ALJ evaluated Mr. Elliott's physical abilities to work *without* surgery and fashioned an RFC the ALJ believed accommodated his left knee dysfunction and resultant limitations as if he did not have surgery. Thus, even without surgery, the ALJ found that Mr. Elliott is capable of working at sedentary jobs.

The authority cited by Mr. Elliott discusses the distinction between an ALJ's decision that a claimant is not disabled at all because she refused treatment and a decision that a claimant's credibility regarding her symptoms is compromised by her refusal to seek treatment. *Rousey v. Heckler,* 771 F.2d 1065 (7th Cir. 1985). If the former, the ALJ must make a finding (which must be reasonable) that the claimant will not be disabled if she undergoes the prescribed treatment. If the latter—a credibility analysis—the ALJ's reasoning must only be logical. *Id.* at

16

1069-70. In *Rousey,* the ALJ erred on both scores, and with respect to the credibility analysis, erred by attacking the claimant's credibility regarding pain for failing to undergo treatment when there was no link between that treatment and alleviating the pain. *Id.* at 1070.

Here, there is a logical link between the pain and physical limitations Mr. Elliott testified he experiences and the ACL tear in his left knee. Mr. Elliott's doctors made that link (*see* Dr. Dasgupta's discussion of Mr. Elliott's pain and decision to send him to an orthopedic surgeon for a consultation, R. 147). *See also Ogranaja v. Commissioner of Social Security,* 186 Fed. Appx. 848, 851 (11th Cir. 1006) (affirming ALJ's credibility determination which relied, in part, on the claimant's "refusal to undergo recommended surgery"); *Farrior v. Astrue,* 2011 WL 3157150 at *5 (E.D.N.C. July 11, 2011) (ALJ did not err in discounting claimant's credibility regarding his pain and other limiting symptoms when the claimant decided to forego surgery in favor of more conservative treatment); *cf. Cooley v. Astrue,* 2011 WL 2554222 at *4 (C.D. Cal. June 27, 2011) (ALJ should not discount credibility of claimant who declines surgery if she has good reasons for doing so).

It was not legal error for the ALJ to consider as a part of his credibility analysis that Mr. Elliott had refused the surgery his orthopedic surgeon prescribed and scheduled. That refusal logically may suggest (as it did to the ALJ) that the excruciating pain and other symptoms Mr. Elliott says he feels (which he says keep him from standing for more than 15 minutes, sitting for more than 20 minutes, stooping and kneeling at all, and leave him in so much pain that medications do not help much and he must rock himself continuously) are not really as bad as he says. (R. 18).

Given the substantial deference the court owes to the ALJ's credibility finding, the court finds that the ALJ's finding is not patently wrong.

17

**C.    There is no requirement that jobs exist within the county where a claimant lives or can easily travel to by bus or other public transportation.**

Mr. Elliott makes one final argument—an argument that has no support. He contends that because the vocational expert was unable to identify any jobs fitting Mr. Elliott's RFC within Marion County or the surrounding seven counties to which bus service is available, then the Commissioner failed his burden to show that jobs existed in "reasonable proximity" to where Mr. Elliott lives. He cites *Barrett v. Barnhart,* 355 F.3d 1065 (7th Cir. 2004), for this proposition, but leaves out that the court used the term "reasonable proximity" as its shorthand description of the VE's testimony regarding the number of jobs available within the state the claimant lived. *Id.* at 1067. The Social Security Act and corresponding regulations are clear that the relevant geographical area where jobs must exist is in the national economy, defined as "the region where [the claimant] live[s] or in several other regions of the country" and "[i]t does not matter whether work exists in the immediate area in which you live." *See* 42 U.S.C. § 423(d)(2)(A) (individual is disabled only if he cannot perform his past work and there is no "substantial gainful work which exists in the national economy regardless of whether such work exists in the immediate area in which he lives"); 20 C.F.R. § 404.1566(a) ("work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country"). Mr. Elliott's contention that only jobs that exist in the county where Mr. Elliott lives or surrounding counties that he can reach using public transportation is without merit.

## Conclusion

The ALJ formulated an RFC consistent with his analysis of the record evidence, including medical records and Mr. Elliott's testimony, and that took into account accommodating the severe impairment of Mr. Elliott's left knee. The ALJ did not, however, evaluate the opinion

of treating physician Dr. Dasgupta regarding "disability" and Mr. Elliott's physical limitations, or decide (with supporting evidence) the weight to give the opinion. Based on the record in this case, and particularly the facts that testimony at the hearing focused on Dr. Dasgupta's opinion and that the ALJ cited every record of Dr. Dasgupta's treatment except his disability opinion, the court is convinced that there is a gap in the ALJ's analysis that must be addressed on remand.

Accordingly, the court REVERSES and REMANDS the decision of the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

So ORDERED.

Date: 08/26/2011

_____
Debra McVicker Lynch
United States Magistrate Judge
Southern District of Indiana

Distribution:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Patrick Harold Mulvany
patrick@mulvanylaw.com